IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

JENNIFER L. BERGERON, Deputy Public )
Defender, Pinal County, on behalf of )
JOSEPH LOUIS PEREZ, )
                                     )
                        Petitioner,  )
                                     )
            v.                       )
                                     )
HON. WILLIAM J. O'NEIL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Pinal, and HON. )
COLIN F. CAMPBELL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Maricopa, )
                                     )
                       Respondents,  )      2 CA-SA 2003-0053
                                     )      2 CA-SA 2003-0054
            and                      )      2 CA-SA 2003-0055
                                     )      2 CA-SA 2003-0060
THE STATE OF ARIZONA,                )      (Consolidated)
                                     )      DEPARTMENT B
            Real Party in Interest.  )
                                     )      O P I N I O N
_____)
                                     )
BRET HUGGINS and RAYMOND BECK,       )
Deputy Public Defenders of Pinal County, )
on behalf of JEREMY MYERS and JOHN )
J. NEWSOME,                          )
                                     )
                       Petitioners,  )
                                     )
            v.                       )
                                     )
HON. WILLIAM J. O'NEIL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Pinal, and HON. )
COLIN F. CAMPBELL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Maricopa, )
                                     )

Respondents, )
)
and )
)
THE STATE OF ARIZONA, )
)
Real Party in Interest. )
)
———————————————————— )
)
BRADLEY SOOS, on behalf of )
THE STATE OF ARIZONA, )
)
Petitioner, )
)
v. )
)
HON. WILLIAM J. O'NEIL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Pinal, and HON. )
COLIN F. CAMPBELL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Maricopa, )
)
Respondents, )
)
and )
)
PATRICK LEWIS, )
)
Real Party in Interest. )
)
———————————————————— )
)
DAVID W. GREGAN, MARIO E. )
URRUTIA, and LAWTON CONNELLY, )
on behalf of SHANNON DUVALL, )
CONNIE STEVENS, and KENNETH L. )
FARNSWORTH, )
)
Petitioners, )
)
v. )
)
HON. WILLIAM J. O'NEIL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Pinal, and HON. )

COLIN F. CAMPBELL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Maricopa, )
 )
 )
Respondents, )
and )
 )
THE STATE OF ARIZONA, )
 )
Real Party in Interest. )
 )
 )
 )
RAYMOND BECK, Deputy Public )
Defender of Pinal County, on behalf of )
GAVINO GARCIA BARRERAS and )
RUDOLPH SALAS, )
 )
Petitioners, )
 )
v. )
 )
HON. WILLIAM J. O'NEIL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Pinal, and HON. )
COLIN F. CAMPBELL, Judge of the )
Superior Court of the State of Arizona, in )
and for the County of Maricopa, )
 )
Respondents, )
 )
and )
 )
THE STATE OF ARIZONA, )
 )
Real Party in Interest. )
 )

SPECIAL ACTION PROCEEDINGS

Pinal County Cause Nos. CR 200300475, CR 200300463, CR 200300419,
CR 200300326, CR 20026792, CR 200300199, CR 200300368,
CR 200300512, CR 200300563, and CR 200201387

RELIEF GRANTED

Ralph E. Ellinwood                                      Tucson
                                    Attorney for Petitioner Bergeron


Eleanor L. Miller                                      Phoenix
                                    Attorney for Petitioners
                                    Huggins and Beck

Robert Carter Olson, Pinal County Attorney
  By Bradley Soos                                      Florence

      and

Jones, Skelton & Hochuli
  By Georgia Staton and Eileen Dennis GilBride          Phoenix
                                    Attorneys for Petitioner Soos

Nicholas S. Hentoff                                      Phoenix
                                    Attorney for Petitioners Gregan,
                                    Urrutia, and Connelly

Terry Goddard, Arizona Attorney General
  By Anne C. Longo                                      Phoenix
                                    Attorneys for Respondents

E C K E R S T R O M, Judge.

¶1        In these consolidated special actions, we are asked to determine whether an attorney who has filed a notice of change of judge pursuant to Rule 10.2, Ariz. R. Crim. P., 16A A.R.S., and who has therein avowed that the notice was not being filed for any improper purpose may be ordered to divulge his or her reasons for seeking a change of judge. We conclude that compelling counsel to divulge the reasons for filing a notice in accordance with Rule 10.2 is contrary both to the rule's express terms and its intent. For that reason, we further conclude that respondents,

4

Judges O'Neil and Campbell, proceeded in excess of their jurisdiction and legal authority when they failed to immediately reassign the underlying actions as required by the express terms of that rule.

BACKGROUND

A.    The Rule.

¶2          Rule 10.2 provides, in relevant part, as follows:

> a.    Entitlement.  In any death penalty case, any party shall be entitled to request a change of judge as a matter of right no later than ten (10) days after the state files a notice of intention to seek the death penalty.  In any criminal case other than a death penalty case, each side is entitled as a matter of right to a change of judge. Each such non-death penalty case, whether single or consolidated, shall be treated as having only two sides:  provided that, whenever two or more parties on a side have adverse or hostile interests, the presiding judge or that judge's designee may allow additional changes of judge as a matter of right.
>
> b.    Procedure.  A party may exercise his or her right to a change of judge by filing a pleading entitled "Notice of Change of Judge" signed by counsel, if any, stating the name of the judge to be changed.  The notice shall also include an avowal that the request is made in good faith and not:
>
> 1.    For the purpose of delay;
>
> 2.    To obtain a severance;
>
> 3.    To interfere with the reasonable case management practices of a judge;
>
> 4.    To remove a judge for reasons of race, gender or religious affiliation;
>
> 5.    For the purpose of using the rule against a particular judge in a blanket fashion by a prosecuting agency, defender group or law firm (State v. City Court of Tucson, 150 Ariz. 99, 722 P.2d 267 (1986));

6. To obtain a more convenient geographical location; or

7. To obtain advantage or avoid disadvantage in connection with a plea bargain or at sentencing, except as permitted under Rule 17.4(g).

The avowal shall be made in the attorney's capacity as an officer of the court.

. . . .

d. At the time of the filing of a notice of change of judge, the parties shall inform the court in writing if they have agreed upon a judge or judges who are available and are willing to have the action assigned to that judge. An agreement of all parties upon such judge may be honored and, if so, shall preclude further changes of judge as a matter of right unless the agreed judge becomes unavailable. If no judge has been agreed upon, then the presiding judge shall immediately reassign the action.

¶3 Effective July 1, 2001, the supreme court added the mandatory avowals in Rule 10.2(b) on an experimental basis to address the perception that the rule was being abused. Ariz. R. Crim. P. 10.2 cmt. Although the amendments were to remain in effect until June 30, 2002, the supreme court has twice extended them. Ariz. Sup. Ct. Order (June 9, 2003) (extending amendments to January 23, 2004).

B.    The Special Actions.

¶4 These special actions arose out of criminal proceedings in Pinal County Superior Court and involve nine different defendants in ten cases. In State v. Lewis, CR 20026792, petitioner Bradley Soos, Deputy Pinal County Attorney, filed a notice of change of judge seeking to remove Pinal County Superior Court Judge Gilberto V. Figueroa from the case pursuant to Rule 10.2. Finding that it appeared the office of the Pinal County Attorney had "repetitively" filed such notices as to Judge Figueroa, respondent Judge O'Neil, the Presiding Judge of Pinal County

6

Superior Court, assigned the matter to respondent Judge Campbell, the Presiding Judge of Maricopa County, for the purpose of "reviewing" the notice. In forwarding the notice to Judge Campbell, Judge O'Neil noted that Soos had filed notices as to Judge Figueroa in four other cases between January 13 and March 31, 2003.

¶5 On April 23, Judge Campbell ordered Soos to appear before him on May 2 to "provide a reason and explanation as to why a Notice of Change of Judge was filed by him" in the underlying action. Soos filed a motion to vacate the April order and the May 2 hearing, asking that the case be assigned to a new judge. Alternatively, Soos asked Judge Campbell to stay the May 2 hearing so Soos and the State of Arizona could seek special action relief in this court. Soos attached to that motion the affidavit of Robert Carter Olson, the Pinal County Attorney, in which Olson stated that his office did not "have a practice of filing a notice of change of judge pursuant to Rule 10.2 against a particular judge in a blanket fashion." He also stated that his deputy county attorneys are authorized to file notices "in good faith and not for any improper purpose."

¶6 On April 16, petitioner Bret H. Huggins of the Pinal County Public Defender's office filed a notice of change of judge in State v. Myers, CR 200300463, seeking to remove respondent Judge O'Neil from that case. Similarly, on April 24, petitioner Raymond Beck of the Pinal County Public Defender's office filed a notice of change of judge in State v. Newsome, CR 200300419, and in another case involving the same defendant, CR 200300326, seeking to remove Judge O'Neil. And, on April 16, petitioner Jennifer L. Bergeron, also of the Pinal County Public Defender's office, filed a similar notice in State v. Perez, CR 200300475. Judge O'Neil referred these matters to Judge Campbell, who ordered Huggins, Beck, and Bergeron to appear before him on May 2 for the same reason he had ordered Soos to appear before him: to explain

7

the reasons for filing the Rule 10.2 notices and to ensure the notices had not been filed for an improper purpose. Huggins filed a motion to quash the order requiring his appearance, a request to expedite a hearing on the motion to quash, and a motion to stay the May 2 hearing indefinitely or, alternatively, for a brief stay so he could seek a stay in this court.

¶7        Judge Campbell consolidated these and other cases involving similar notices for the limited purpose of considering the notices. Petitioners and their attorneys participated in a May 1 telephonic hearing before Judge Campbell addressing the propriety of proceeding with the May 2 hearing. Petitioners argued that the orders that compelled them to explain their reasons for having filed the notices were contrary to the intent of Rule 10.2. They asserted that, once proper notices had been filed, Judge O'Neil was required to reassign the cases.

¶8        Judge Campbell disagreed. He analogized the right to a change of judge under Rule 10.2 to the right to peremptorily strike a juror. Judge Campbell reasoned that, just as Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and its progeny require counsel to explain why they struck a juror in determining whether the strike was based on race or gender, such an inquiry should be permitted to determine the propriety of counsel's utilization of Rule 10.2 to remove a judge from a case. Judge Campbell further concluded that the "[c]ourt has the inherent authority to review a Rule 10.2 Notice for impropriety" and that "[t]he Rule itself contemplates that there will be judicial review of a notice." Judge Campbell then stayed the May 2 hearing until May 16.

¶9        Soos, Bergeron, Huggins, and Beck filed petitions for special action challenging the orders entered by Judges O'Neil and Campbell. We consolidated the petitions and granted petitioners' request for a stay of the May 16 hearing. Petitioners David W. Gregan, Mario

8

Urrutia, and Lawton Connelly, attorneys practicing in the office of Gregan & Associates, requested and were permitted to join in the special actions. These petitioners had filed notices seeking to remove Judge O'Neil in State v. Duvall, CR 200300199, State v. Farnsworth, CR 200300512, and State v. Stevens, CR 200300368. And, like the other petitioners, they had been ordered to appear on May 2 to explain their reasons for using Rule 10.2 to remove Judge O'Neil.

¶10 Meanwhile, on April 29, Beck filed two additional notices of change of judge in State v. Garcia Berreras, CR 200300563, and State v. Salas, CR 200300387, seeking to remove Judge O'Neil. Judge O'Neil referred these cases to Judge Campbell, who ordered Beck to appear on May 30 to explain his reasons for filing the Rule 10.2 notices. Beck filed a petition for special action, which we consolidated with the other three petitions; we also granted Beck's request for a stay of the hearing before Judge Campbell.

## SPECIAL ACTION JURISDICTION

¶11 Petitioners contend they have no equally plain, speedy, or adequate remedy by appeal. See Ariz. R. P. Special Actions 1(a), 17B A.R.S. We agree. As petitioners correctly note, and the respondent judges concede, appellate challenges relating to a peremptory request for a change of judge are appropriately reviewed by special action. Taliaferro v. Taliaferro, 186 Ariz. 221, 223, 921 P.2d 21, 23 (1996) (appellate review of denial of notice of change of judge filed pursuant to Rule 42(f)(1), Ariz. R. Civ. P., 16 A.R.S., Pt.1, must be obtained by special action); Brush Wellman, Inc. v. Lee, 196 Ariz. 344, ¶5, 996 P.2d 1248, ¶5 (App. 2000) (finding special action review appropriate to determine whether party entitled to peremptory removal of judge under Rule 42(f), Ariz. R. Civ. P., when request made after remand from appellate court and party had exercised peremptory removal of judge before appeal); Fiveash v. Superior Court, 156

9

Ariz. 422, 423, 752 P.2d 511, 512 (App. 1988) (special action proper means for seeking appellate review to determine whether defendant, whose plea agreement trial court had rejected and who had been granted change of judge pursuant to Rule 17.4(g), Ariz. R. Crim. P., 17 A.R.S., entitled to peremptory change of judge under Rule 10.2, Ariz. R. Crim. P., as to judge subsequently assigned to case).

¶12    Moreover, the issues raised in the special actions require us to determine the meaning and correct application of Rule 10.2, a legal question of statewide importance to the judiciary and the litigants who come before it on criminal matters.  Brush Wellman, 196 Ariz. 344, ¶5, 996 P.2d 1248, ¶5; see also City of Tucson v. Superior Court, 167 Ariz. 513, 513, 809 P.2d 428, 428 (1991) (finding acceptance of special action jurisdiction appropriate when "issue presented is a pure issue of law that is of statewide significance").  In addition, the litigants present us with an issue of first impression.  See Blake v. Schwartz, 202 Ariz. 120, ¶7, 42 P.3d 6, ¶7 (App. 2002); State ex rel. Pennartz v. Olcavage, 200 Ariz. 582, ¶8, 30 P.3d 649, ¶8 (App. 2001) (acceptance of special action jurisdiction appropriate "in cases involving a matter of first impression, statewide significance, or pure questions of law").  Accordingly, we accept jurisdiction of these special actions.

DISCUSSION

¶13    Petitioners assert that no language in Rule 10.2, or in any other rule or statute, authorizes a judge to question a litigant about the basis for seeking a change of judge once a proper notice has been filed in full compliance with Rule 10.2(b).  Petitioners maintain that Rule 10.2(d) expressly requires presiding judges to "immediately reassign" cases upon receipt of notices that comply fully with the rule.

10

¶14    By contrast, the respondent judges insist that they possess the authority to question counsel based on what they characterize as the "long recognized," "inherent power" "every court has . . . to do what it deems necessary for the efficient exercise of its jurisdiction."[1] In this vein, the respondent judges suggest that the decision to question counsel in these cases was justified by "repetitive and excessive notices" as to Judges O'Neil and Figueroa. In their view, this pattern "had the outward appearance of violating Rule 10.2's prohibitions." The judges maintain that the experimental amendments of Rule 10.2, as well as the comments to that rule, and Ethical Rule 8.4(g), Ariz. R. Prof'l Conduct, Ariz. R. Sup. Ct. 42, 17A A.R.S., contemplate such an inquiry.

¶15    We find that the clear language of Rule 10.2, its purpose, its history, and the case law addressing it all reflect a deliberate intent by the supreme court to retain a litigant's right to an automatic change of judge. In this light, we cannot authorize a procedure that constructively amends the rule by conditioning the exercise of that right on a potential judicial inquiry into the litigant's reasons for seeking a change of judge.

¶16    In determining the meaning of a rule promulgated by the supreme court, "we apply principles of statutory construction." State v. Baca, 187 Ariz. 61, 63, 926 P.2d 528, 530 (App. 1996). Consequently, "[o]ur primary objective is to discern and give effect to the intent of . . . our supreme court in promulgating [the rule]." Vega v. Sullivan, 199 Ariz. 504, ¶8, 19 P.3d 645, ¶8 (App. 2001). "[W]e focus on the language of the . . . rule and, if it is inconclusive or ambiguous, we then consider other factors such as [its] context, subject matter, effects, consequences, spirit, and purpose." Id.

---

[1]The Arizona Attorney General has properly appeared on behalf of the respondent judges because "the purpose of the response is to explain or defend an administrative practice [or] policy." Hurles v. Superior Court, 174 Ariz. 331, 333, 849 P.2d 1, 3 (App. 1993).

¶17        Each party "is entitled as a matter of right to a change of judge." Ariz. R. Crim. P. 10.2(a) (emphasis added). Once a party or counsel has filed a notice in compliance with the rule, "the presiding judge shall immediately reassign the action" unless the parties agree upon a judge. Ariz. R. Crim. P. 10.2(d) (emphasis added). In an opinion issued after the 2001 amendments, the supreme court reiterated the continuing force of these provisions: "Rule 10.2 entitles either party in a criminal case to a change of judge as a matter of right. . . . A court cannot disregard a timely notice of a change of judge." Godoy v. Hantman, 205 Ariz. 104, ¶6, 67 P.3d 700, ¶6 (2003) (citation omitted). Thus, the mandatory language of Rule 10.2 itself contradicts any claim that a court may exercise its own discretion in deciding whether to make the required reassignment. Nor does any other provision of the rule permit a judge to question counsel about the veracity of his or her avowal before honoring the notice and assigning the case to a different judge.

¶18        Although Rule 10.2 is so clear on its face that we need not look to its history, context, spirit, or purpose to construe it, our interpretation of Rule 10.2 is only reinforced by that exercise. "Arizona is in the minority of states that permit peremptory changes of judge in criminal proceedings." Fiveash, 156 Ariz. at 425, 752 P.2d at 514; see also 5 Wayne R. LaFave et al., Criminal Procedure § 22.4(d) (2d ed. 1999). In cases pre-dating the 2001 amendments, our supreme court and this court have acknowledged and defended the mandatory, automatic nature of Rule 10.2.

¶19        In State v. City Court of Tucson, 150 Ariz. 99, 722 P.2d 267 (1986), our supreme court held that the chief magistrate of a city court lacked the authority to require city prosecutors

to avow they had filed their notices in good faith. Although the magistrate in question had good reason to suspect an abuse of the rule,[2] the court reminded the parties that

> Rule 10.2 permits a party to disqualify a judge for no cause or reason. Under Rule 10.2, a party may exercise his right to a change of judge merely by filing a pleading entitled "Notice of Change of Judge." No allegation of bias or prejudice is required by Rule 10.2.

Id. at 102, 722 P.2d at 270. The court added that, "[o]nce the Notice of Change of Judge has been filed, the procedure under Rule 10.2 is summary and automatic." Id.; see also State v. Keel, 137 Ariz. 532, 534, 672 P.2d 197, 199 (App. 1983).

¶20        In State v. Greenlee County Justice Court, Precinct 2, 157 Ariz. 270, 756 P.2d 939 (App. 1988), we relied on City Court of Tucson and held that the superior court did not have authority to require prosecutors to make avowals of good faith when they filed a peremptory challenge to a justice of the peace. There, we concluded that, once a proper notice had been filed pursuant to Rule 10.2, the justice of the peace had been required to transfer the case to a new judge and had exceeded his legal authority by failing to do so. Greenlee County Justice Court, 157 Ariz. at 273, 756 P.2d at 942; see also State v. Neil, 102 Ariz. 110, 112-13, 425 P.2d 842, 844-45 (1967) (filing of notice of change of judge required trial court to transfer case to another judge); State v. Shahan, 17 Ariz. App. 148, 149, 495 P.2d 1355, 1356 (1972) (litigant has peremptory right to disqualify judge, and if notice is timely, case must be transferred to another judge).

---

[2]The city prosecutor had issued a blanket order to his assistant attorneys to peremptorily challenge the city magistrate in question—an action that the supreme court found to be a genuine abuse of the rule. City Court of Tucson, 150 Ariz. at 103, 722 P.2d at 271.

¶21        Nor can the later 2001 amendments to Rule 10.2 be interpreted as a renewed invitation for trial courts to engraft their own preconditions on the operation of the rule. Although the supreme court did adopt the 2001 amendments to address a perceived abuse of the rule, see Rule 10.2 cmt., those amendments constituted the supreme court's best judgment at the conclusion of a vigorous debate on whether the rule should be abolished altogether.[3] In light of this debate, the supreme court installed the avowal procedure set forth in Rule 10.2(b), a specific mechanism for requiring attorneys to demonstrate that they have not abused the rule. It also articulated a remedy if attorneys violate the rule notwithstanding facial compliance with the avowal procedure, potential punishment through the state bar disciplinary process. Ariz. R. Crim. P. 10.2 cmt. to 2001 amendments; ER 8.4(g), Ariz. R. Prof'l Conduct.[4] Given that the supreme court received the benefit of extensive debate and thereafter so carefully set forth the remedies for potential abuse of the rule, we cannot conclude that the 2001 amendments implicitly permit superior courts to supplement those amendments with remedies of their own design.

---

[3]Then Chief Justice Zlaket noted that Justices Jones and Martone had dissented from the order amending the rule and were in favor of abolishing it. Ariz. Sup. Ct. Order (May 23, 2001) (experimentally amending Rule 10.2, effective July 1, 2001, to June 30, 2002). Judge Campbell, the Presiding Judge of Maricopa County Superior Court, and three of his colleagues filed formal comments to the rule stating that they favored severely limiting the rule because their court suffered administrative difficulty from reassigning cases. In re Rule 10.2, R. No. 00-0025 cmt. by Maricopa County Presiding Judge and Criminal Department Presiding Judge (filed March 8, 2001). The board of governors of the State Bar of Arizona opposed the amendments, apparently based on the board's belief that, because the requirements of Rule 10.1 were so difficult to meet, "some mechanism is necessary to replace judges without acrimony and confrontation." In re Rule 10.2, R. No. 00-0025 cmt. by the State Bar of Arizona (filed March 16, 2001). The Yuma County Attorney had similar comments, noting the need for a process to reassign cases that avoided embarrassment to judges and attorneys. In re Rule 10.2, R. No. 00-0025 cmt. by Yuma County Attorney (filed March 15, 2001).

[4]The comment also noted that wholesale abolition of the right of a peremptory change of judge is a potential remedy for continued abuse of the rule.

14

¶22 In fact, the mechanism respondents utilized here—requiring a hearing set before another judge in which the litigant must explain the grounds for filing the notice—is the same species of procedure set forth in Rule 10.1 to address a motion for a change of judge for cause. See Ariz. R. Crim. P. 10.1(b) and (c). If the supreme court had intended to apply such a procedural remedy for potential abuse of Rule 10.2, it was certainly aware of that potential procedural remedy and could have imposed it in the 2001 amendments.

¶23 Moreover, respondents' orders directly contradict the purpose of Rule 10.2 as described by the supreme court and articulated by case law. In its comment to the 2001 amendments, the supreme court observed: "Rule 10.2 is intended to ensure a party's right to have a matter heard before a fair and impartial judge without the necessity of divulging details that could cause needless embarrassment and antagonism or showing actual bias which may be difficult to prove." (Emphasis added.) Therein, the supreme court cited with approval our opinion in Anonymous v. Superior Court ex rel. County of Pima, 14 Ariz. App. 502, 484 P.2d 655 (1971). In that case, we observed:

> While other states require that the affidavit of bias and prejudice set forth the facts upon which the allegation of bias and prejudice is based . . . , Arizona has the salutary rule making disqualification automatic. Thus, in this state it is not necessary to embarrass the judge by setting forth in detail the facts of bias, prejudice or interests which may disqualify him nor is it necessary for judge, litigant and attorney to involve themselves in an imbroglio which might result in everlasting bitterness on the part of the judge and the lawyer.

Id. at 504, 484 P.2d at 657. In short, the perceived policy benefits of Rule 10.2 depend on a mechanism by which litigants may remove a judge without explaining their basis for doing so. Rule 10.2 was specifically designed to provide such a mechanism. For this reason, the procedure

respondents ordered in this case—requiring petitioners to explain their basis for a change of judge—undermines the very purpose of the rule and the chief mechanism by which it operates. In approving the 2001 amendments, the supreme court could not have intended the superior courts to employ a procedural remedy for suspected abuse that so directly contradicts the purpose of the rule.[5]

¶24        As noted, respondent judges contend that courts have "inherent power to do what [they] deem[] necessary for the efficient exercise of their jurisdiction." They assert this power includes the authority to question petitioners because it appeared petitioners were violating the rule. Respondents point to statistics on the number of times petitioners used the rule to remove Judges O'Neil and Figueroa during a specific period, insisting that the numbers "amounted to prima facie evidence of a rule violation . . . [and that Judge O'Neil] thus properly invoked the court's inherent power to make further inquiries to determine whether a rule violation had, in fact, been committed." The respondent judges rely on A.R.S. § 12-122, which states that "[t]he superior court, in addition to the powers conferred by constitution, rule or statute, may proceed according to the common law." The respondent judges maintain that the statute recognizes the court's inherent powers and argue that, "[o]nce a court has jurisdiction over a matter, it may exercise its inherent powers for the ordinary and efficient exercise of that jurisdiction."

---

[5]In light of Rule 10.2's requirement that attorneys specifically avow that they have filed a notice in good faith and not for any impermissible reason, respondents' orders, which in essence require petitioners to appear and demonstrate the veracity of those avowals, suggest that the attorneys' avowals cannot be trusted. Such orders carry an inherent challenge to an attorney's credibility and thereby ensure the very acrimony Rule 10.2 was designed to prevent. The tone of petitioner Bergeron's pleadings exemplifies how such orders will be received by counsel. Bergeron complains that order "implies that judges are able to tell when attorneys—as officers of the court—are willing to lie to the court . . . . Once again, this attitude reveals the unfortunate state of relationships between the bench and the bar . . . ."

16

¶25 First, the statistics submitted to us do not present a compelling basis for suspecting that petitioners had been abusing the rule. Those statistics demonstrate only that each petitioner had filed repeated notices against a particular judge. Those statistics tell us nothing about whether the grounds for those exercises were proper. If a particular attorney possessed a permissible reason under Rule 10.2 for using a "peremptory strike," that concern might well reemerge each time the attorney had a case assigned to the same judge.

¶26 Second, a "blanket" use of the rule against a particular judge does not constitute an abuse unless it is conducted by a "prosecuting agency, defender group or law firm." Ariz. R. Crim. P. 10.2(b)(4), citing City Court of Tucson. A blanket challenge occurs when chief prosecutors or public defenders instruct their deputies to disqualify a certain disfavored judge in all criminal cases of a particular nature. City Court of Tucson, 150 Ariz. at 102, 722 P.2d at 270; see also People v. Superior Court, 10 Cal. Rptr. 2d 873, 874 n.1 (Ct. App. 1992). Nothing in the rule prohibits individual attorneys who work for an agency or firm from exercising their individual discretion to repeatedly file Rule 10.2 notices naming a particular judge. In his affidavit, the Pinal County Attorney denied that his office has a "blanket" policy of disqualifying any one particular judge. In fact, none of the petitioners here moved to strike the same judge on every occasion.[6] Additionally, we find no evidence in the record before us that supports respondents' contention that petitioner Soos's notices against Judge Figueroa were "based on race

---

[6]The report of the Pinal County Superior Court administrator showed, for example, that petitioner Beck filed a notice as to Judge O'Neil in eleven out of twelve cases or 91.67 percent of the cases assigned between January 1 and May 2, 2003; Bergeron disqualified O'Neil in three out of five cases or 60 percent of the cases assigned; Huggins disqualified O'Neil in four out of six cases or 66.67 percent of the cases assigned; and the Gregan "agency" sought to remove O'Neil in five out of seven cases or 71.43 percent. Petitioner Soos disqualified Judge Figueroa in five out of six cases or 83.33 percent of the cases assigned during this period.

17

or filed in a blanket fashion" or that the use of the rule to remove Judge O'Neil was for the purpose of interfering with his "reasonable case management practices, or to avoid the Judge's lawful (although possibly perceived as harsher) sentencing practices." On the record before us, respondents offer nothing more than speculation about petitioners' motives for repeatedly striking particular judges.

¶27        Nor are we persuaded by respondents' argument that they possess inherent authority to issue the orders in question. Although it may be true as a general proposition that trial courts have inherent authority to enter orders that facilitate the orderly and efficient execution of their jurisdiction, see Owen v. City Court, 123 Ariz. 267, 268, 599 P.2d 223, 224 (1979), and Fenton v. Howard, 118 Ariz. 119, 121, 575 P.2d 318, 320 (1978), the supreme court has been given the exclusive power to make rules relative to all procedural matters in any court. Ariz. Const. art. VI, § 5(5); see also State v. Blazak, 105 Ariz. 216, 217, 462 P.2d 84, 85 (1969) (supreme court has exclusive power to promulgate procedural rules); State v. Jackson, 184 Ariz. 296, 298, 908 P.2d 1081, 1083 (App. 1995) (same). Any court may exercise its inherent power to make and amend rules governing its own local practice. But such rules cannot be inconsistent with the supreme court's rules and, in fact, cannot become effective until approved in writing by the supreme court. Ariz. R. Crim. P. 36, 17 A.R.S.

¶28        In City Court of Tucson, the supreme court addressed this limitation on the authority of local courts in the very context presented by the case at hand. 150 Ariz. at 103, 722 P.2d at 271. As noted above, the court held that the chief magistrate of a city court lacked authority under Rule 10.2 to require city prosecutors to avow that they had filed their notices in good faith. Id. There, the court construed the magistrate's order as an intrusion on the supreme

18

court's exclusive authority to make procedural rules for Arizona's courts. Id. In so doing, it emphasized that its rule-making authority "'may not be supplemented or superseded'" by state courts of more limited jurisdiction. Id., quoting Hare v. Superior Court, 133 Ariz. 540, 542, 652 P.2d 1387, 1389 (1982); see also Anderson v. Pickrell, 115 Ariz. 589, 566 P.2d 1335 (1977). Although the magistrate had not suggested that her order constituted a local rule, the supreme court concluded that "the order was in effect a local rule which was not approved by this court and is of no force and effect." Id.; see also Hare, 133 Ariz. at 542, 652 P.2d at 1389 (superior court "policy" of rejecting plea agreements after a certain deadline was equivalent to local rule that must be approved by supreme court); State v. Darelli, 404 Ariz. Adv. Rep. 9, ¶20 (Ct. App. July 22, 2003) (interpreting individual judge's decision to reject last-minute plea negotiation as intrusion on supreme court's rule-making authority).

¶29     In short, a superior court may not use its inherent authority to "supplement" the supreme court's procedural rules with remedial orders of its own creation when, as here, those orders frustrate the intent of a rule in question. Such orders are construed as local rules not approved by the supreme court. Under City Court of Tucson, a court lacks inherent authority to issue an order that either supersedes or supplements the explicit provisions of a supreme court procedural rule unless it first adopts a local rule and receives approval of that rule from the supreme court. Here, respondents have conditioned petitioners' right to a change of judge under Rule 10.2 on a procedure that, at minimum, would supplement the rule and, arguably, undermine

19

it altogether.[7]  In so doing, respondents have acted in excess of their authority.  See Mitchell v. Superior Court, 142 Ariz. 332, 335, 690 P.2d 51, 54 (1984) (superior court procedural order void because it produced a result contrary to the rules promulgated by the supreme court).

¶30        Respondents also contend that the exercise of a peremptory strike of a judge is analogous to the peremptory striking of a juror.  Just as counsel may be compelled to establish race- and gender-neutral reasons for having stricken a potential juror, see Batson, respondents argue that counsel may be required to establish that they have not employed Rule 10.2 for an improper purpose.  See Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71, 131 L. Ed. 2d 834, 839 (1995).

¶31        The respondent judges note that the supreme court drew the same analogy in its comment to ER 8.4(g), but the analogy is of limited significance.  The jury selection process implicates constitutional rights of defendants and jurors, requiring a balancing and recognition of both.  See Batson, 476 U.S. at 87, 106 S. Ct. at 1718, 90 L. Ed. 2d at 81.  Rule 10.2, however, does not enforce a federal constitutional right.  Rather, it articulates a procedural right created by the supreme court.  As a result, the supreme court must determine the process that must be followed to exercise and enforce it.  Thus, although Batson illustrates a procedure by which the supreme court might choose to address abuses under Rule 10.2, that case has nothing to say on

---

[7]Other courts have reached similar conclusions and precluded judicial inquiry into the reasons underlying counsel's peremptory change of judge.  See, e.g., Solberg v. Superior Court, 561 P.2d 1148, 1158 (Cal. 1977) (permitting such judicial inquiry "would rewrite the statute in the guise of construing it, would introduce procedural complications resulting in delay, and would contravene the fundamental policies" underlying the change-of-judge statute); Bower v. Morden, 880 P.2d 245, 249 (Idaho 1994) ("There is no discretionary act involved in ruling upon a motion under [change-of-judge rule] because any motion brought in conformity with the rule must be granted as a matter of right.").

the pivotal legal question here: whether superior courts possess the authority to graft their own procedural overlay on a rule of criminal procedure promulgated and recently amended by the Arizona Supreme Court.

¶32      Nothing in the comment to ER 8.4(g) of the Rules of Professional Conduct suggests that the supreme court considered the propriety of using the Batson methodology to address potential abuses of Rule 10.2. In referring to the peremptory striking of a juror in the comment to ER 8.4(g), the supreme court simply acknowledged that both situations offer a potential for abuse. Indeed, as the 2001 amendments to Rule 10.2(b) demonstrate, the supreme court specifically chose a different procedural mechanism from that employed in Batson and its progeny to address its concerns about abuse.[8]

¶33      Finally, the well-crafted and thoughtful dissent merits some response. The dissent concludes that a trial judge has inherent authority to "inquire into a possible violation of Rule 10.2, either real or perceived, when that judge has determined there is cause to do so" and may

---

[8]People ex rel. Baricevic v. Wharton, 556 N.E.2d 253 (Ill. 1990), cited by the dissent, provides us little guidance in evaluating our Rule 10.2. First, the Illinois provision for a change of judge arose from statute, whereas Arizona's provision arises from a supreme court procedural rule. 38 Ill. Comp. Stat. 5/114-5. Second, the Illinois statute permitted a change of judge exclusively "on the ground that such judge is prejudiced" against a party, Wharton, 556 N.E.2d at 255, quoting 38 Ill. Comp. Stat. 5/114-5(c), while Arizona's rule contains no such limitation. Finally, the Illinois statute contained no explicit provision to remedy potential abuse, but our supreme court has amended Arizona's rule to include such a provision.

Even if we were to overlook the dissimilarities between the Illinois statute addressed in Wharton and Arizona's procedural rule, Wharton could not be compelling authority here because we must be guided first by the conclusions of the Arizona Supreme Court. Our supreme court addressed the same separation-of-powers problem presented in Wharton in the context of our own Rule 10.2. City Court of Tucson, 150 Ariz. at 102-03, 722 P.2d at 270-71. As discussed above, our supreme court came to a different conclusion and barred the trial court from providing its own remedy for perceived abuse of the rule. Id. at 103, 722 P.2d at 271.

21

"investigat[e] a prima facie violation of the rule by requesting an explanation from counsel." That conclusion, however, poses more questions than it answers. On what basis, and using what factors, is a trial judge to "determine[] there is cause" for such inquiry? And what constitutes a "prima facie violation" that supposedly triggers the judge's prerogative to "investigate" and demand an explanation from counsel? What would be the appropriate nature and scope of the inquiry?

¶34            As the dissent correctly notes, a statute's use of the word "shall" may be deemed directory rather than mandatory when the context and underlying purpose support that construction. See Way v. State, 205 Ariz. 149, ¶10, 67 P.3d 1232, ¶10 (App. 2003). But here, as explained above, the history and purpose of Rule 10.2, and our supreme court's consistent interpretation of the rule before and after the 2001 amendments, demonstrate that the language of Rule 10.2(d) is mandatory.

¶35            The dissent further suggests that Rule 10.2(b) is "relegated to an empty and ineffectual exercise" unless trial judges may question attorneys about their reasons for exercising their right to a change of judge. But that assumes attorneys will not honestly execute the avowals now required under Rule 10.2(b) and that judges will be unable or unwilling to report abuses of the rule to the State Bar, as the comments to the 2001 amendments to Rule 10.2 and ER 8.4(g) contemplate. We cannot accept those assumptions. See Solberg v. Superior Court, 561 P.2d 1148, 1157-58 (Cal. 1977) (refusing to assume that "substantial numbers of members of the bar are so neglectful of their personal and professional honor that they repeatedly perjure themselves merely to gain an uncertain advantage in litigation" by making false statements under oath in support of change-of-judge motions); Canon 3D(2), Ariz. Code of Judicial Conduct, Ariz. R. Sup.

22

Ct. 81, 17A A.R.S. ("A judge who receives information indicating a substantial likelihood that a lawyer has committed a violation of the Rules of Professional Conduct should take appropriate action," and a judge "having knowledge that a lawyer has committed a violation of [those rules] that raises a substantial question as to the lawyer's honesty [or] trustworthiness . . . shall inform the appropriate authority.").

¶36        Although respondents may not view the avowal requirement coupled with the State Bar enforcement mechanism as a perfect or adequate remedy for alleged violations of Rule 10.2(b), it is the remedy our supreme court has chosen. Nothing in this record suggests that mechanism is ineffective, unworkable, or somehow "insulates the rule's continued misuse," as the dissent argues.[9] We can reasonably assume that, in interpreting the 2001 amendments to Rule 10.2, the supreme court placed some measure of confidence in both the integrity of this state's trial lawyers (to submit honest avowals) and the vigilance of its trial courts (to refer the rare violator to the State Bar for potential discipline). And, contrary to the dissent's assertion, neither the rule nor this opinion confers "immunity" on attorneys whose avowals under Rule 10.2(b) are false or who otherwise violate the rule.

¶37        In addressing the purpose of the 2001 amendments, the dissent quotes the comments of the Maricopa County judges who sought to abolish Rule 10.2 altogether. Thereby, the dissent usefully highlights some of the perceived drawbacks of the rule. As previously noted, however, the board of governors of the State Bar of Arizona countered the Maricopa County judges with

_____

[9]We question how respondents' proposed remedy for abuse improves upon the avowal requirement explicitly provided by the rule. Those attorneys who have submitted a truthful avowal pursuant to Rule 10.2(c) have committed no violation of the rule. Those few attorneys who would submit an untruthful avowal are not likely to demonstrate any greater honesty in the face of a judicial inquiry.

arguments in favor of the rule. It is not our domain to render any judgment on the merits of these positions, and we do not do so here. In 2001, our supreme court considered those arguments and, in response thereto, provided the remedial structure found in Rule 10.2(b) and the comment to its amendments. We merely hold, as we must, that the courts of Arizona are bound by that conclusion. See Blazak; Jackson.

## CONCLUSION

¶38 By refusing to honor petitioners' exercise of their clients' rights to peremptorily remove a judge and to immediately reassign the case to another judge, respondent Judge O'Neil "failed to . . . perform a duty required by law as to which he has no discretion" or "proceeded . . . without or in excess of jurisdiction or legal authority." Ariz. R. P. Special Actions 3(a) and (b). Similarly, by accepting the referral of these matters from Judge O'Neil, conducting the May 1 hearing, and proposing to conduct another hearing to inquire of petitioners the reasons for their use of Rule 10.2, Judge Campbell also "failed to . . . perform a duty required by law as to which he has no discretion" or "proceeded or is threatening to proceed without or in excess of jurisdiction or legal authority." Ariz. R. P. Special Actions 3(a) and (b). Consequently, we grant special action relief and vacate the respondent judges' orders.


_____
PETER J. ECKERSTROM, Judge

CONCURRING:



_____
JOHN PELANDER, Presiding Judge

24

E S P I N O S A, Chief Judge, dissenting.

¶39        While I agree our special action jurisdiction is properly invoked in this consolidated case, I respectfully disagree that it merits granting relief. The majority goes to some length to justify a severely restrictive view of a trial court's possible involvement in the remedial mechanism added to Rule 10.2 by our supreme court, but I do not believe the strictures of the rule and the intent of our supreme court are as ironclad in this regard as today's opinion propounds. Moreover, the court's ruling is premature and goes further than needed to decide the controversy at hand. The issue here is simply whether a judge of this state can inquire into a possible violation of Rule 10.2, either real or perceived, when that judge has determined there is cause to do so. Questions posed by the majority about the nature and scope of the inquiry, as well as what standards would be employed, while not unimportant, are not presented here, given the truncated procedural posture of the case and meager record before us. Such issues might well have arisen in due course and a more complete record been established had this court not chosen to intervene. Thus, the majority's observation that "we find no evidence" to support the respondent judges' "speculation about petitioners' motives" is a consequence of its own action in staying, and now vacating, the hearing ordered for that specific purpose.

¶40        At the outset, I have difficulty accepting the majority's threshold premise that nothing in Rule 10.2 "permit[s] a judge to question counsel about the veracity of his or her avowal." In fact, nothing in the rule precludes a judge from doing that very thing. Perhaps, as the majority argues, that was true under the old rule and pre-amendment cases cited in support of the majority's position, e.g., City Court of Tucson; Neil; Fiveash; Shahan; Anonymous, all presumably arising in an era predating reports of widespread abuses of the rule. However, the

26

supreme court's addition of specific qualifiers to this long-established rule significantly modifies and narrows the previously unfettered right to peremptorily remove a judge from a case, clearly demonstrates the court's grave concern with abuses of the rule, and suggests, in my view, just the opposite of the majority's conclusion.

¶41 As a general rule, judges are exhorted to play an active role in addressing any unprofessional conduct by lawyers appearing before them. Indeed, Canon 1A of the Arizona Code of Judicial Conduct, Ariz. R. Sup. Ct. 81, 17A A.R.S., directs that judges "shall uphold the integrity and independence of the judiciary" and "should participate in establishing, maintaining and enforcing high standards of conduct." (Emphasis added.) Thus, judges themselves have a duty and the authority to directly address perceived misconduct that affects or that may affect the proceedings before them. See Owen (certain powers essential to dignity and operation of court are implicit, even though they "may not be catalogued in the constitution or statute"); see also Hmielewski v. Maricopa County, 192 Ariz. 1, 960 P.2d 47 (App. 1997) (trial courts have inherent power to sanction bad faith conduct during litigation, independent of rules of procedure); cf. Greenlee County Justice Court (absent any evidence that use of peremptory challenges was attempt to threaten independence and integrity of particular judge, no abuse of rule found).

¶42 Neither the rule's language that "the presiding judge shall immediately reassign the action" nor the reference in the rule's comment to potential state bar discipline for violators, by their terms, diminish a trial court's inherent authority to ensure the integrity of its judicial proceedings and, if necessary, to determine bad faith by a litigant. For one thing, it is unknown whether this matter would have been "immediately reassign[ed]" as a result of, or even despite, the hearing that this court has precluded. Moreover, it is well established that the use of the word

"shall" is not always an absolute mandate but may be merely directive, depending on the intent underlying an enactment and "the effect and consequences of alternative construction." Way, 205 Ariz. 149, ¶10, 67 P.3d 1232, ¶10. Those consequences are highly instructive here.

¶43     Under the majority's holding that a court may never question a Rule 10.2 avowal notwithstanding any compelling impetus to do so, the enactment of the 2001 amendments to the rule is thereby relegated to an empty and ineffectual exercise. The majority takes issue with this observation, asserting that it "assumes attorneys will not honestly execute the avowals," but that is far from the case. There can be little doubt the great majority of Arizona's criminal practitioners, both prosecution and defense, regularly and routinely observe high ethical standards, particularly in making personal avowals to courts before which they appear. The amendments to Rule 10.2, however, were enacted in response to a presumably small but significant minority of lawyers who have abused the rule and continue to do so. As recently as October 2002, the supreme court reiterated its concern, "based upon the data already gathered, that Rule 10.2 notices are still being used for improper purposes." Ariz. Sup. Ct. Order No. R-00-0025 (Oct. 7, 2002). For that minority, today's decision ensures that an avowal under the rule remains little more than a pro forma procedure.

¶44     The majority also argues that this conclusion suggests lack of confidence in "the vigilance of [our] trial courts" but, again, that argument misses the mark. The reality is that, for practical purposes, trial courts' hands are tied. A court that is directly affected in its case management and dignity by repeated notices is well situated to question, and if necessary, make a determination of, the underlying motivation for the notices. But if it cannot, under appropriate circumstances, even inquire into the general basis for a litigant's repeated utilization of the rule,

how can the court ever reasonably and ethically refer a suspected violator to the state bar? Under Canon 3D(2), Arizona Code of Judicial Conduct, a judge should report misconduct when he or she has knowledge that a lawyer has committed a violation raising a substantial question about that lawyer's honesty or fitness. Contrast that provision with the more general directive in Canon 3D(2) that a judge with information indicating a "substantial likelihood" that a lawyer has violated the rules of professional conduct "should take appropriate action." See also ER 8.3, Ariz. R. Prof'l Conduct, Ariz. R. Sup. Ct. 42, 17A A.R.S. The majority's position is inconsistent with these long-established guidelines.

¶45        Furthermore, if an affected court can take no direct action to ensure that a litigant's motives for routinely invoking the rule do not run afoul of its express prohibitions, who, then, can or will? And what purpose could be served or incentive exist for the judge, or anyone else, to file a formal bar complaint, even if it were appropriate to do so on mere suspicion, in a remote forum not well suited for resolving such questions and in a time frame that likely would have no bearing on the litigation? It is notable that research reveals no state bar disciplinary cases whatsoever arising from ER 8.4(g), Ariz. R. Prof'l Conduct, the exclusive remedy cited by the majority, despite the supreme court's observation that abuses have nevertheless continued well after that provision's enactment. It is also significant that, while the court's comment provides that a violator "may" face bar discipline, Rule 10.2 cmt., Ariz. R. Crim. P., the court did not say or suggest that that is the only possible consequence or avenue, although it easily could have done so. As Justice Feldman noted in Leavy v. Parsell, 188 Ariz. 69, 73-74, 932 P.2d 1340, 1344-45 (1997):

> [C]ertainly our courts can recognize and take action when unprofessional conduct occurs in the course of litigation. Judges

29

need not and should not permit unseemly conduct simply because it may not go far enough to warrant imposition of disciplinary sanctions. To be silent in the face of unprofessional conduct is ultimately to encourage it. It is our experience that judges get what they demand from lawyers, and our courts have an obligation to demand and thus promote proper conduct by the bar. This court has been disturbed by a growing trend in unprofessional conduct in and out of the courtroom.

¶46 That judges on occasion question and put to the test the avowals of counsel during the course of litigation is neither radical nor novel. And courts routinely conduct hearings on all manner of things related to the cases at bar, even when the rules of procedure do not expressly provide for such. A good example is the Batson doctrine, to which I believe Judge Campbell aptly analogized. Once the Supreme Court clarified that, although peremptory strikes can be exercised for any reason, they cannot be used for a prohibited one, it became incumbent on courts to conduct limited inquiries into lawyers' motivations for exercising such strikes if it was suspected the strikes were based on an illegitimate ground. See Batson, 476 U.S. at 95, 106 S. Ct. at 1722, 90 L. Ed. 2d at 86-87, quoting Alexander v. Louisiana, 405 U.S. 625, 630, 92 S. Ct. 1221, 1225, 31 L. Ed. 2d 536, 541-42 (1972) ("When circumstances suggest the need, the trial court must undertake a 'factual inquiry' that 'takes into account all possible explanatory factors' in the particular case.").

¶47 Notwithstanding the majority's view, I do not find the situation here far removed from the Batson scenario. Indeed, another court has readily made that connection. See People ex rel. Baricevic v. Wharton, 556 N.E.2d 253, 259 (Ill. 1990) (state's right to peremptory substitution of judge similar to its right to peremptorily challenge venirepersons—in both instances, basis for removal generally not subject to judicial scrutiny unless "it appears that such motions are being used to thwart the [court's] independent assignment authority"). Once our

30

supreme court made clear that certain bases for invoking Rule 10.2 are prohibited, trial courts' authority to, in appropriate circumstances, "look behind" a peremptory strike of a judge became manifest, even though not specified by any rule of court or state statute. Were this not the case, it is doubtful that any violation of the rule could ever be established, particularly on grounds related to race, gender, or religious affiliation. See In re Rule 10.2, R. No. 00-0025, Petition to Amend Rule 10.2, filed on behalf of the Arizona Judicial Council (Dec. 14, 2000) (alleged abuse of the rule may be "difficult, if not impossible, to prove . . . in a Bar disciplinary proceeding"). Yet, as Arizona's courts continue to grow in racial, ethnic, and gender diversity, this becomes an increasing concern and another reason why this court today takes a wrong turn. An unquestionable peremptory judicial challenge "provide[s] a barrier-free bypass for litigants with . . . race-based suspicions. With the small proportion of judges of color in most jurisdictions, attorneys can safely predict that a minority judge who is challenged usually will be replaced by a white judge." Nancy J. King, Batson for the Bench?, 82 Judicature 74, 76 (Sept./Oct. 1998).

¶48 The majority also draws much support from the rule's policy of avoiding "embarrassment" or "antagonism" between court and counsel, but that is not a compelling basis for the majority's conclusions. Although it is clear that both the historical and continuing intent of the rule is to permit a lawyer to strike a judge without explanation, see 10.2 cmt., Ariz. R. Crim. P., this policy falls short of justifying the absolute rule espoused today. That salutary design is only a means rather than "the very purpose of the rule," as characterized by the majority, and must be viewed in the context of the rule's origins and true objective.

¶49 The right to disqualify a judge is grounded on the fundamental right to a fair trial that includes "the right to have the trial presided over by a judge who is completely impartial and

31

free of bias or prejudice." Neil, 4 Ariz. App. at 112, 425 P.2d at 844; cf. Anonymous, 14 Ariz. App. at 504, 484 P.2d at 657 (peremptory strike obviates "setting forth in detail the facts of bias, prejudice or interests which may disqualify [a judge]"). But, as noted in the formal comments of the Maricopa County judges who advocated greatly restricting if not abolishing Rule 10.2, it has been widely used merely to "judge shop and to seek trial delay." In re Rule 10.2, R. No. 00-0025 cmt. by Maricopa County Presiding Judge and Criminal Department Presiding Judge (filed March 8, 2001). Those judges concluded: "Rather than remove the occasional and rare abusive judge, it is used as a tool to delay cases and . . . discipline judges." Id. In a separate comment, the Pinal County presiding judge noted that "[t]he rule in its original design was meant to handle that 'rare and unusual circumstance' in which a party or an attorney might not want to bring with particularity an issue between that judge and the attorney. However, that purpose was abandoned long ago." Thus, the true policy of the rule—ensuring a fair trial by an impartial judge—is not aided by the immunity this court now confers, with only passing regard for our supreme court's clear concern about widespread abuses, its specific delineation of prohibited practices, and its threatened abolition of the rule entirely.

¶50     Furthermore, while avoiding embarrassment and antagonism is surely desirable, it is hardly a reason for insulating abuses of the rule or clearing the way for even a small minority of attorneys or their clients who might utilize it to invidiously practice racial, religious, or gender discrimination. Nor does it outweigh other important policies such as timely justice for crime victims, efficient court administration, and conservation of judicial resources. Ill feelings may, in any event, already exist to a significant degree when a lawyer or law firm repeatedly strikes the same judge, not to mention the profound and long-lasting effect a formal bar complaint would have

32

on the professional relationship, particularly if the referral were based on mere unverified suspicion, whether borne out at some point or not.

¶51        Finally, contrary to the majority's position, the question here is not whether superior courts can "supplement" Rule 10.2 with their own "procedural overlay," or even whether a court can routinely inquire into the validity of Rule 10.2 notices. The only issue presented is whether a trial court is absolutely precluded from investigating a prima facie violation of the rule by requesting an explanation from counsel. In this regard, it may be disingenuous of some of the parties to suggest that, because they did not file Rule 10.2 notices one hundred percent of the time, there was no cause for concern, a sentiment the majority embraces. However, the trial judges involved here, highly experienced and fully familiar with the legal communities they serve, scarcely acted casually or without substantial reason. Their suspicions were well grounded on an inordinate number of strikes by most, if not all, of the parties involved, whether or not properly characterized as "blanket challenges" and, contrary to the implication of today's decision, their assessments are worthy of some credibility if not deference. In any event, the majority's reliance on the prohibition against a court's enacting its own "local rules" is not well founded. City Court of Tucson involved a broad order issued by a chief magistrate directing that all Rule 10.2 notices in all cases filed by the prosecutor's office would henceforth bear an avowal of good faith, not unlike the added requirement of the 2001 amendment. No such action is at issue here. Judge Campbell's order merely directed specific individuals suspected of abusing the rule in specific cases to appear and explain their conduct.

¶52        What is also not at issue is the nature of the inquiry and at what point a judge's ability to investigate a potential or perceived violation of the rule may end, since, in their haste

33

to conduct a preemptive strike, the parties have avoided any type of substantive hearing at all. Although the contested order contains broad language, it is certainly possible that the parties, all experienced criminal attorneys, could have readily satisfied Judge Campbell's inquiry without delving into any privileged information or causing any of the "embarrassment" the rule was designed to avoid. But we will now likely never know. Instead, the majority chooses to set an unnecessary and unwarranted precedent that emasculates any ability of judges to call into question any use of Rule 10.2 regardless of how questionable, that neutralizes the express prohibitions added by the supreme court, and that insulates the rule's continued misuse.

¶53        On this record, such as it is, I would uphold the orders below.

_____

PHILIP G. ESPINOSA, Chief Judge